IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

LORRI L. CLEER,

               Plaintiff,

v.                                    CIVIL  ACTION  NO.  3:08-0265

JOHN W. CLEER, JR., and
COLLEEN S. CLEER,

               Defendants.

**MEMORANDUM OPINION AND ORDER**

      Pending before the Court is Defendants' Motion for Summary Judgment (doc. 36).  For

the following reasons, the Court **GRANTS** the motion.

**I. FACTS**

      Defendants John and Colleen Cleer, a married couple, owned and operated a heating and air

conditioning business known as Liberty Technicians, Inc. (Liberty).   On November 2, 2000,

Defendants sold Liberty to Plaintiff, their daughter, Lorri Cleer, for $285,000, payable in monthly

payments of $2562.15.  Because Defendants carried the note for Plaintiff, a security agreement was

also executed between the parties, as was a redemption agreement, a stock sale agreement, and a

lease agreement.  (Defendants owned the property used by the business.)  Uniform Commercial

Code (U.C.C.) filings and various releases were also prepared for Liberty.  All of these documents

were prepared by counsel.  Plaintiff was not represented by counsel, although she acknowledged that

she received the documents prior to closing and could have had them reviewed by separate counsel if she wished.

Plaintiff married Mickey Thompson in January 2002. According to Plaintiff, Mr. Thompson "was heavily involved in the day-to-day operations of Liberty." *Plaintiff's Complaint*, at ¶ 8. He bid on 99 percent of the installation jobs and managed the technicians. At her deposition, Plaintiff testified she was not comfortable managing the technicians, and she agreed that she was not "familiar with the technical aspects" of Liberty's operations. *November 20, 2008 Deposition of Lorri Cleer*, at p. 19. The parties agree that Mr. Thompson's involvement with Liberty was critical to its success. At least by 2004, the relationship between Plaintiff and Mr. Thompson was deteriorating, and the health of Liberty suffered as a result. In August 2004, Plaintiff petitioned for a divorce, which was finalized in September 2004. Mr. Thompson ultimately left Liberty, although the date and circumstances of his departure are not clear. In her response, Plaintiff states that she fired Mr. Thompson on March 1, 2005. However, in her deposition, Plaintiff recalled that "[h]e quit the day he got married," June 22, 2005,[1] although she also noted that he had previously "quit" for some period of "weeks" prior to his final departure. *Id.* at p. 39. Mr. Thompson stated in his deposition that he quit on June 23, 2005, although he denied ever previously quitting for a period of weeks.

In any event, on August 27, 2004, Defendants sent Plaintiff a letter "stating a lack of confidence in her ability to operate the business and required monthly profit and loss reports, as well as, statements from monthly statements of vendors." *Plaintiff's Complaint*, at ¶ 9. Defendants state that they sent this letter because, as secured creditors, they were concerned about their collateral in

---

[1]In fact, Mr. Thompson got married on June 26, 2005. *February 16, 2009 Deposition of Mickey Thompson*, at p. 47.

light of Liberty's decline.  They also sent letters alleging the misappropriation of certain receivables and demanding that Plaintiff produce receipts for property taxes paid.  On February 11, 2005, Defendants demanded a special shareholder meeting.  Plaintiff suggests that this was improper because Defendants owned no shares in Liberty by that time, but Defendants observe that the stock had been pledged as collateral to Plaintiff's loan.  Sometime that month, or in early March, Defendant declared Plaintiff in default of the security agreement, "and took steps outlined in that document to recover their business."  *Defendants' Memorandum in Support*, at p. 3-4.  Plaintiff alleges that these steps entailed "Defendant[s][] and/or their agents [breaking] into the offices of Liberty . . . , and proceed[ing] to retrieve and copy corporate files."  *Plaintiff's Complaint*, at ¶ 14.

Plaintiff further alleges Defendants offered her $100,000 for Liberty on March 1, 2005, but she rebuffed their offer.  She claims that on March 3, 2005, therefore, Defendants and Mr. Thompson met with one of Liberty's major customers, Steel of West Virginia (SWVA), "in an attempt to take away business from Liberty."  *Plaintiff's Complaint*, at ¶ 15.  Mr. Thompson's employment status with Liberty at this time remains somewhat unclear.[2]  Plaintiff testified that she thought she had learned about this meeting from Mr. Thompson: "As far as I can remember, Mickey [Thompson] told me. . . . [B]ut I'm not 100 percent sure how I know.  But he told me, we did this, we're going to go to every one of your customers until you have none . . . ."  *November 20, 2008 Deposition of Lorri Cleer*, at p. 59.  At any rate, Plaintiff concedes that SWVA did not terminate its

---

[2]In her response, Plaintiff claims she fired Mr. Thompson on March 1, 2005.  However, in the depositions of both Plaintiff and Mr. Thompson, they agree that he quit on June 22 or 23, 2005.  Plaintiff also added in her deposition that Mr. Thompson had previously quit for some period of weeks at some time prior his final departure, but no dates are given.  Moreover, in her deposition, Plaintiff never claimed she fired Defendant, on March 1 or any other date.  However, she did posit that the alleged March 3 meeting with SWVA "probably" occurred during "that period where [Mr. Thompson] left."  *November 20, 2008 Deposition of Lorri Cleer*, at p. 63.

relationship until several months later, after Liberty was unable to perform a job ordered by SWVA.

In the summer of 2005, Defendants started a new heating and air conditioning business, Air Tech. Plaintiff alleges the existence of this new company violated the terms of their sale of Liberty to her, although Defendants point out that the contract did not contain a non-compete clause. She also claims that Defendants attempted to induce Liberty employees to leave their positions and work for Air Tech. According to Plaintiff, in November 2006, she "attempted to work out an arrangement where she could pay the required monthly installment payment" owed to Defendants under the contract. *Plaintiff's Complaint*, at ¶ 21. However, Defendants rejected this offer and, ten days after the due date of the lease payment, declared a default on the lease agreement and took over the business. They also took over operation of Liberty, which they renamed "Liberty Air Technicians." Plaintiff states that she now has no access to Liberty's corporate records, and that she has been contacted by creditors and governmental tax authorities seeking payment.

Defendants dispute much of Plaintiff's characterizations of the events surrounding the formation of Air Tech, the lease default, and the takeover of Liberty. Defendants state that in November 2006, as Plaintiff has agreed, she "kn[ew] [she] could no longer run the company" and was "ready to give up" the business, and she therefore voluntarily relinquished it to Defendants. *November 20, 2008 Deposition of Lorri Cleer*, at p. 77; *Defendants' Memorandum in Support*, at p. 4. Defendants refute that they attempted "in any way, shape or form" to take customers or employees from Liberty. *February 27, 2009 Deposition of John Cleer, Jr.*, at p. 75. Moreover, according to Defendants, the "arrangement" sought by Plaintiff in November 2006 was to turn over Liberty to Mr. Thompson, who had left in June 2005. Plaintiff would then own the real estate and collect rent from him. Defendants acknowledge that to the extent Plaintiff proposed this solution,

4

it was rejected by them.  Defendants further assert that Plaintiff has not made any required payments since October 2006.

## II. SUMMARY JUDGMENT STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Fed. R. Civ. P.* 56(c).  In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]"  *Anderson*, 477 U.S. at 256.  Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

### III. DISCUSSION

**A. Breach of Contract: Unlawful Competition**

Plaintiff claims Defendants breached the contract for the sale of Liberty when they subsequently started Air Tech and, according to Plaintiff, attempted to lure Liberty's customers away from it. However, as Defendants point out, "there is no [n]on-[c]ompete clause in any of the documents" that constitute the contract between Plaintiff and Defendants. *Defendants' Memorandum in Support*, at p. 5. Plaintiff seeks to circumvent this apparent roadblock in two ways. First, she argues that Defendants told her "during the initial negotiations" for the sale of Liberty that "they were no longer interested in the heating and air condition business" and that "they only wished to retire and enjoy their later years." *Plaintiff's Response*, at p. 4. Second, she attempts to read a non-compete provision into paragraph 8 of the Redemption Agreement.

As an initial matter, Plaintiff has produced no evidence that Defendants ever made any statements to her about the reason for their desire to sell Liberty or their intentions afterwards. Plaintiff refers the Court generally to the deposition of her father, but none of his testimony supports her claim that statements such as those quoted above were made to her. Rather, Defendant Mr. Cleer only stated that "[his] wife wanted to retire, more so than [him], and Mickey [Thompson] and my daughter [Plaintiff] wanted to run the business or have their own business." *February 27, 2009 Deposition of John Cleer, Jr.*, at p. 15. Moreover, even if Defendants made such statements to Plaintiff, they were not part of the contract and could not be relied upon by Plaintiff. They cannot now be construed as a non-compete provision.

Plaintiff's reliance on paragraph 8 of the Redemption Agreement is equally misplaced. In relevant part, that section stated: "The Retiring Stockholders further agree that neither of them will

6

retain any interest in the Corporation within ten (10) years from the date of the redemption, and will notify the Internal Revenue Service of the acquisition of any forbidden interest within the ten (10) year period." *Redemption Agreement*, at ¶ 8. Defendant claims that Plaintiff breached this provision when they created Air Tech "and then usurped the Plaintiff's business out from under her." *Plaintiff's Response*, at p. 4. However, the Court disagrees with Plaintiff that this was a non-compete provision that prevented Defendants from starting their own company. Tellingly, when Plaintiff was asked in her deposition if she could "point . . . to *anywhere* in [the] contracts where it says [Defendants] couldn't [start a heating and air conditioning business]," Plaintiff responded, "I don't know." *November 20, 2008 Deposition of Lorri Cleer*, at p. 69 (emphasis added). As Defendants explain, "IRS regulations required this provision because Defendants made capital gain elections concerning the sale of their stock." *Defendants' Reply*, at p. 6. Further, Plaintiff has acknowledged that she was in default when Defendants "usurped" her business. *Plaintiff's Response*, at p. 4. She has come forward with no evidence to contradict Defendants' explanation of what happened, that "Defendants did nothing other than take back the collateral pledged by Plaintiff as security for her [defaulted] note." *Defendants' Reply*, at p. 6.

Plaintiff's argument suffers from an even more fundamental problem than the lack of a non-compete provision: her lack of evidence of competition. While Plaintiff asserts in her complaint that "[t]he operation of Air Tech and the attempt to lure customers away from Liberty cause [sic] Mr. [sic] [Ms.] Cleer to suffer significant damages and loss of revenue," she can point to no actual competition, lost customers, or damages. *Plaintiff's Complaint*, at ¶ 27. Plaintiff complains that Defendant Mr. Cleer and Mr. Thompson approached SWVA on March 3, 2005 "in an attempt to take away business from Liberty," *Plaintiff's Complaint*, at ¶ 15, but she acknowledges that Air

Tech had not been formed at that time, SWVA did not cease doing business with Liberty until the fall of 2005, and that it did not become a customer of Air Tech at that time (or any other time for that matter). At her deposition, Plaintiff was asked: "Can you name . . . a single customer that your parents' new company took away from Liberty Technicians?" *November 20, 2008 Deposition of Lorri Cleer*, at p. 69. Defendant simply replied, "No." *Id.*

Not surprisingly, Plaintiff has also produced no evidence of damages. When asked at her deposition what her damages were, Plaintiff replied, "I suppose the only damage–the main damage that I could say is just psychologically to me, affected me to the point where I couldn't . . . ." *Id.* at 81. At that point in her deposition, defense counsel rephrased his question in terms of "any lost revenue." *Id.* However, Plaintiff said she could not identify lost revenue at that time. She was similarly unable to identify any of the "significant damages in regard to debts owed to certain creditors and vendors as a result of the breach of the contract" that she had claimed in her complaint. *Id.*

In short, Plaintiff has offered no evidence that Defendants ever competed with her, even assuming they had a duty not to do so. The deposition testimony of Defendant Mr. Cleer essentially remains uncontradicted:

> I didn't solicit, I didn't infer [sic], I didn't wink, I didn't in any way, shape or form try to take any customers at any time, because I didn't want her to fail. I didn't want that to happen. I just was ready if and when it happened that I could go back into business again. But I didn't want her to fail, nor did I take any customers, nor employees.

*Deposition of John Cleer, Jr.*, at p. 75-76. Plaintiff has the burden of presenting evidence to contradict this testimony. She has not carried that burden, and summary judgment as to this claim is warranted.

**B. Breach of Contract: Failure to Liquidate**

Plaintiff claims that Defendants also breached the contract, apparently the security agreement, "by assuming the operation of Liberty Technicians, Inc., instead of liquidating Liberty Technicians, Inc.," after she defaulted on repayment of the loan. *Plaintiff's Complaint*, at ¶ 29. Under Paragraph 6 of the security agreement:

> Upon the occurrence of any such event of default, and at any time thereafter, [Defendants] shall have the rights and remedies of a secured party under the Uniform Commercial Code in addition to the rights and remedies provided herein or in any other instrument or paper executed by Debtor. [Defendants] may require Debtor to assemble the Collateral [(defined elsewhere in the security agreement as "accounts receivable, inventory, equipment, fixtures, furnishings, machinery, furniture, tools, contracts and parts")] and proceeds and make them available to [Defendants] at a place to be designated by [Defendants] which is reasonably convenient to both parties.

*Security Agreement*, at ¶ 6.  U.C.C. § 9-609 further states: "Secured Party's Right to Take Possession After Default: (a) After default, a secured party: (1) may take possession of the collateral; and (2) without removal, *may* render equipment unusable and dispose of collateral on a debtors's premises under Section 9-610."  (emphasis added).  Subsection (c) effectively repeats the language of the security agreement itself: "[A]fter default, a secured party may require the debtor to assemble the collateral and make it available to the secured party at a place to be designated by the secured party which is reasonably convenient to both parties."  Official Comment 2 to § 9-609 explains: "[Section 9-609] provides that the secured party is entitled to take possession of collateral after default."

Plaintiff attempts to read § 9-609 and § 9-610, to which § 9-609 refers, as requiring a secured party to sell the collateral upon repossession.  However, like § 9-609, § 9-610 only states that a

secured party "*may* sell, lease, license or otherwise dispose of any or all of the collateral." (emphasis added).  On the other hand, § 9-610 also provides for the means through which "[a] secured party may purchase collateral."  According to subsection (c), purchase may occur at a public or private disposition, but only at the latter "if the collateral is of a kind that is customarily sold on a recognized market or the subject of widely distributed price quotations." § 9-610(c).  In any event, the Court declines to determine whether either the U.C.C. or the security agreement required Defendants to liquidate Liberty's assets or, if they wished to keep them, to purchase them at a public disposition.  Even if Defendants' decision not to liquidate Liberty's assets breached their contract with Plaintiff, she cannot show any damages, an essential element of her claim.

At the time of Plaintiff's last payment to Defendants in October 2006, she owed them $206,145.57.  Plaintiff claims that when Defendants resumed control of Liberty in November 2006, its value exceeded this amount.  Plaintiff argues that the value of the business was "approaching over three hundred thousand dollars," as evidenced by the fact that Defendants previously offered to purchase it for $100,000 and forgiveness of the loan balance.[3]  *Plaintiff's Supplemental Memorandum in Opposition*, at p. 2.  However, this "evidence" does not amount to more than a scintilla.  According to Plaintiff, this offer was made on March 1, 2005.  Therefore, this offer preceded the Defendant's resumption of control of Liberty by approximately eighteen months.  During these eighteen months, the profitability and thus the value of Liberty declined significantly.  It is also noteworthy that Mr. Thompson, whom the parties agree was vital to Liberty's operations, left during this period.

---

[3]In fact, the record does not indicate that this offer included forgiveness of the debt owed.  In support of her contention, Plaintiff cites to page 54 of Defendant Mr. Cleer's deposition, but he makes no reference to forgiveness of the loan.

Moreover, the Court cannot ignore the relationship between the parties and Defendants, as well as the context in which the offer was made.  Defendants had built Liberty into a successful company, but under the stewardship of their daughter, they watched the company fall apart in front of them.  Even more problematic for Defendants, Liberty, which served as the collateral for the loan, effectively constituted their retirement savings.  If Plaintiff could not or would not pay the loan, all the while depleting the value of Liberty, Defendants would be left with nothing.  Therefore, Defendants offered Plaintiff "$100,000 to walk out." *February 27, 2009 Deposition of John Cleer, Jr.*, at p. 54.  It would be a considerable irony indeed to permit Plaintiff to maintain her claim on the basis of an offer by Defendants, when the amount of that offer may have been arrived at by considerations distinct from a strict economic valuation of Liberty's worth.  While the Court does not suggest that the parties' relationship or the context of the offer alters the legal rights of either party, these facts add to the unreliability of the $300,000 figure as a realistic measure of Liberty's worth.  For these reasons, the fact that Defendants offered Plaintiff $100,000, and perhaps forgiveness of her loan, does not constitute evidence of damages.

Alternatively, Plaintiff argues that the value of Liberty in November 2006 was at least $207,320, because that amount is the total value of the company's assets, using a cost-basis approach, as listed in the 2006 Asset Detail Report prepared with Liberty's 2006 tax return.  Plaintiff also speculates that "[i]t would be likely that in a public sale the assets would bring higher values than were anticipated in the asset valuation," although she offers no explanation to support this claim.  *Plaintiff's Supplemental Memorandum in Opposition*, at p. 2.  Finally, she claims that because "the asset valuation only shows tangible assets and does not value intangibles such as accounts receivable, established customer base and goodwill[,] [m]arketing Liberty as a going

concern would most likely have garnered higher prices from prospective third party purchasers."
*Id.*

This purported "evidence" is also insufficient to withstand Defendant's summary judgment challenge. As Defendants observe, Plaintiff's reliance on the 2006 Asset Detail Report is misplaced. Plaintiff's use of a cost-basis approach looks only at what was paid for Liberty's assets and completely ignores their depreciation, which had been claimed by Liberty for tax purposes.[4] Factoring in depreciation, it appears that the value of Liberty's assets would have been less than half of that claimed by Plaintiff. Indeed, considering the fact that Liberty declined substantially throughout 2006 and 2007, its value was likely less than even that reduced figure. At his deposition, Defendant Mr. Cleer testified that when Defendant Mrs. Cleer and he resumed control over Liberty, it had no assets "of any significant amount." *February 27, 2009 Deposition of John Cleer, Jr.*, at p. 74. The company trucks "were deteriorated," and some could only be driven after receiving a "jump." *Id.* at p. 73. The premises were also "neglected," and "[t]he glass was knocked out of the front offices where there apparently had been some fighting going on." *Id.* at p. 72. Liberty had no employees by this time.

Plaintiff's unsubstantiated assertion that Liberty's value exceeded the asset report figure due to the value of its "intangibles such as accounts receivable, established customer base and goodwill" also lacks evidentiary support. *Plaintiff's Supplemental Memorandum in Opposition*, at p. 2. Defendant Mr. Cleer's uncontradicted testimony was that Defendants "never received any of [the accounts receivable], not a nickel," perhaps because Plaintiff kept a post office box where checks were sent. *February 27, 2009 Deposition of John Cleer, Jr.*, at p. 86. Similarly, it is difficult to

---

[4]It bears noting that even if the Court were to ignore depreciation of Liberty's assets, their value of $207,320 would only barely exceed the loan balance of $206,145.57.

imagine what "established customer base and goodwill" Liberty continued to enjoy.  Liberty had been on a steady and substantial decline, at least since Mr. Thompson's departure sometime in 2006. When Defendants resumed control, it had no employees.  Surely, the value of any customer base or goodwill was minimal, at best, by November 2006.

In total, the evidence introduced by Plaintiff that Liberty's value exceeded her debt under the loan in November 2006 constitutes, at most, a mere scintilla and cannot withstand Defendants' summary judgment motion.  The Court notes that Plaintiff could have, but did not, retain an expert witness to offer a valuation of Liberty.  Although there may have been other ways to arrive at a suitable estimate of Liberty's value, unsupported speculation is not one of them.  Importantly, for their part, Defendants concede that "they must credit the Plaintiff for the value of any . . . assets," reduced as that value may be, "and are prepared to do so in their counterclaim for damages." *Defendant's Supplemental Response*, at p. 3.  At any rate, Plaintiff, having failed to offer evidence of damages, a necessary element of her breach of contract claim, cannot prevail.  Summary judgment should be granted.

### C. Tortious Interference with Business Relationship: Customers

Under West Virginia law, tortious interference requires a showing of four elements:

> (1) existence of a contractual or business relationship or expectancy;
>
> (2) an intentional act of interference by a party outside that relationship or expectancy;
>
> (3) proof that the interference caused the harm sustained; and
>
> (4) damages.

Syl. pt. 2, *Torbett v. Wheeling Dollar Sav. & Trust Co.*, 314 S.E.2d 166 (1983).

Plaintiff contends that Defendants interfered with Liberty's business relationship with SWVA when Defendant Mr. Cleer and Mr. Thompson met with SWVA on March 3, 2005. According to Plaintiff, this meeting was an "attempt[] to lure [a] customer[] away from Liberty" that "caused Mr. [sic] [Ms.] Cleer to suffer significant damages and loss of revenue." *Plaintiff's Complaint*, at ¶ 33-34. Plaintiff claims Defendant Mr. Cleer "testified at his deposition that he advised Mr. Mike Fleishman [Liberty's SWVA contact] that he would personally be able to take over any work handled by Liberty Technicians and make sure that any work requested by [SWVA] would be handled by him personally." *Plaintiff's Response*, at p. 7. Although Plaintiff provides no citation, she apparently refers to page 46 of Defendant Mr. Cleer's deposition transcript, where he testified that, at the March 3 meeting, "[w]e were reassuring [Mr. Fleishman] that he didn't need to worry about the company not taking care of their service needs, that Mickey and/or myself would see it to it that their service needs were met." *February 27, 2009 Deposition of John Cleer, Jr.*, at p. 46. Defendants argue that "[t]he purpose of that meeting was to reassure the client and keep them a customer of Liberty . . . at a time when Plaintiff's business ineptness was causing this client to feel uncomfortable," *Defendants' Memorandum in Support*, at p. 10, although Plaintiff points out that "this meeting was not sanctioned by the owner of Liberty." *Plaintiff's Response*, at p. 7. The Court makes no finding whether this meeting constituted "an intentional act of interference by a party outside [the] relationship," because Plaintiff has offered zero "proof that the interference caused the harm sustained." Syl. pt. 2, *Torbett*, 314 S.E.2d 166.

The alleged harm underlying Plaintiff's claim is that SWVA terminated its business relationship with Liberty. However, all of the evidence produced by the parties points to the conclusion that SWVA did not terminate the relationship because of any actions undertaken by

Defendants.  Although the meeting with SWVA took place at the beginning of March 2005, SWVA did not cease placing work orders with Liberty until the fall of that year, at least six and a half months after the meeting.  In fact, in her deposition, Plaintiff essentially acknowledged that SWVA left for a reason wholly unrelated to the meeting.  As Plaintiff explained, SWVA needed "a retrofit for one of the big cranes," but Liberty was unable to fulfill the order: "I had lost the main man who knew how to do that type of job.  And the parts stayed over there and were not installed because I didn't have the manpower to complete the job." *November 20, 2008 Deposition of Lorri Cleer*, at p. 69.  Moreover, Plaintiff has agreed that if the meeting was an "attempt[] to take [SWVA] away," it "wasn't successful," because SWVA never became a customer of Defendant's new company, Air Tech. *Id.* at 64.  Indeed, at her deposition, Plaintiff could not "name . . . a single customer that [her] parents' new company took away from Liberty." *Id.* at 70.

To survive summary judgment, Plaintiff must come forward with at least some evidence on each of the elements of the claim.  Because she has not shown evidence that Defendant Mr. Cleer's meeting with SWVA had anything to do with it ceasing to do business with Liberty, this claim must fail.

**D. Tortious Interference with Business Relationship: Customers**

Plaintiff also argues that Defendants tortiously interfered with Liberty's relationship with its employees.[5]  Although Plaintiff mentions a few employees in her deposition,[6] her briefing is limited to Mr. Thompson.   Plaintiff theorizes that, "[i]f it was not for the Defendants' interference, . . . [P]laintiff may have been able to smooth the transition of Mickey Thompson out of the company or keeping [sic] Mickey Thompson actively involved with the Company." *Plaintiff's Response*, at p. 9.  She claims that Defendants bought Mr. Thompson a company vehicle and encouraged him to quit Liberty without warning.  She further states that Mr. Thompson told her that these acts were part of a "plan" to force Liberty out of business, so that Defendant Mr. Cleer and Mr. Thompson could take it over.  *November 20, 2008 Deposition of Lorri Cleer*, at p. 69.  She also claims that there was "maybe" another "plan of [Defendant Mr. Cleer] and Mickey starting

_____

[5]In her response, Plaintiff argues that Defendants also interfered with Liberty's relationship with its creditors.  Plaintiff did not make this claim in her complaint.  Plaintiff notes that Defendant Mr. Cleer "contacted a creditor [of Liberty] about the financial dealing between that creditor and Liberty." *Plaintiff's Response*, at p. 9.  (Apparently, this is a reference to the conversation between Defendant Mrs. Cleer and Lyon Conklin, discussed on pages 52 and 53 of Mr. Cleer's deposition transcript.)  However, to the extent that Plaintiff now seeks to maintain this claim, she cannot.  Plaintiff volunteers, somewhat nonsensically, that "[o]ne can not know for sure the affect [sic] of one Creditor, the Defendants, contacted another Creditor, in this case a vendor about the status of payments." *Id.*  Nonetheless, she then speculates that "[t]his kind of direct interference most likely put a strain on the financial dealings between the Plaintiff and its vendors." *Id.*  The Court is not convinced that this claim could survive a motion to dismiss, let alone a motion for summary judgment.  In any event, Plaintiff offers no evidence, and her unsupported (and unreasonable) inferences do her no good.  To the extent that Plaintiff claims interference with creditors, summary judgment is appropriate.

[6]In her deposition, Plaintiff introduced the possibility that Defendants interfered with the employment of Davey Jones and Shawn Moss.  However, when asked "[w]hat made [her] think somebody talked to Davey and Shawn . . . to try to get them to leave their . . . employment [with Liberty]," Plaintiff responded, "I can't answer that about Davey and Shawn." *November 20, 2008 Deposition of Lorri Cleer*, at p. 69.  Thus, Plaintiff concedes she has no evidence regarding the employment of these men.

another business." *Id.* In Plaintiff's view, this "interference" ultimately contributed to Mr. Thompson's departure.

The Court must contrast this unsubstantiated inference with Defendants' evidence that Mr. Thompson left Liberty for reasons unrelated to Defendants' actions. In his deposition, Defendant Mr. Cleer testified that he spoke with Mr. Thompson about coming to work for him, but only in the event that Liberty went out of business under Plaintiff's control. According to Defendant Mr. Cleer, far from conspiring with Mr. Thompson to bring about Liberty's demise, he strongly hoped that such an outcome could be avoided: "And you think I like that? I don't like that. I didn't want to have that to happen." *February 27, 2009 Deposition of John Cleer, Jr.*, at p. 49. More importantly, Defendant Mr. Cleer testified that Mr. Thompson utterly rebuffed his offer, contingent as it was:

> He hated it. He hated the whole situation. He didn't want to do that.
> I didn't want to do it either. And nothing was ever done, there was
> just some talk. He never came to work for me. He never went on any
> jobs for me. He never did anything under–you know as an employee
> or a partner or anything with any customer ever, to my knowledge,
> under my guidance or whatever, never.

*Id.* at 49-50.

Mr. Thompson's own deposition testimony supports the conclusion that he quit Liberty for reasons unrelated to any interference from Defendants. He denies ever receiving any vehicle from Defendants. He says Defendant Mr. Cleer and he had discussions about starting a business together, in part because Mr. Thompson "needed a job basically."[7] *February 16, 2009 Deposition of Mickey Thompson*, at p. 41. Like Defendant Mr. Cleer, Mr. Thompson also states that nothing became of these talks: "And, you know, we were–thought about it and never really moved on it." *Id.* at p. 41.

---

[7]The Court notes that Mr. Thompson testified that he "needed a job," despite the fact that he was apparently employed for Liberty at this time.

Prior to his final departure on June 23, 2005, Mr. Thompson denied ever having quit Liberty before, except perhaps for "an hour, a day," at some prior time. *Id.* at 49. He recalled, however, being "locked out of the building previous[ly]." *Id.* at 48.

Moreover, aside from testifying that his discussions with Defendant Mr. Cleer essentially fizzled, in his deposition Mr. Thompson seemed to give at least three alternative reasons for leaving Liberty. First, it appears Mr. Thompson was dissatisfied with the environment at Liberty: "[T]he squabbling at the shop between [Defendant] and I and with her and the employees. The boyfriend, you know, there talking to them. Just total–it was a total mess." Second, Mr. Thompson remarried in Las Vegas on June 26, 2005, three days after quitting the business owned by Defendant, his ex-wife. Third, after his return from Las Vegas, Mr. Thompson went into the heating and air conditioning business on his own, but he closed it in less than "a couple months." *Id.* He explained that he closed the business partially because he became "aggravat[ed]" over receiving a bad check from a customer, but also because he "didn't have the heart for it anymore," "just lost interest in it," and "didn't want the aggravation anymore." *Id.* At the time of his deposition in February of this year, Mr. Thompson was working as an electrician in a coal mine.

Plaintiff has not offered evidence that would allow a jury to infer that Defendants interaction with Mr. Thompson, even assuming it could be deemed "interference," contributed to his departure from Liberty. Rather, Defendants' uncontradicted evidence indicates that Mr. Thompson quit Liberty for reasons that had nothing to do with any acts of the Defendants. The only permissible conclusion here is that Defendants did not cause Plaintiff's harm. Summary judgment should be granted.

**E. Fraud**

In West Virginia, the elements of fraud are:

> (1) that the act claimed to be fraudulent was the act of the defendant
> or induced by him; (2) that it was material and false; that plaintiff
> relied upon it and was justified under the circumstances in relying
> upon it; and (3) that he was damaged because he relied upon it.

Syl. pt. 1, *Lengyel v. Lint*, 280 S.E.2d 66 (W. Va. 1981) (quoting *Horton v. Tyree*, 139 S.E. 737, 738 (1927)). Without considering the existence of the first and third elements, the Court finds that Plaintiff's claim fails because she has produced no evidence that she justifiably relied on any fraudulent statements made by Defendants.

Plaintiff argues that she relied on three statements made by Defendant Mr. Cleer during the initial negotiations between the parties for the sale of Liberty. First, she claims that she relied on the fact that her father said that Defendants' sale and Plaintiff's purchase of Liberty was "a win/win situation" and that "this is how families sell businesses to each other." *November 20, 2008 Deposition of Lorri Cleer*, at p. 85. Second, she contends her father defrauded her by telling her that counsel "wrote up the lease purchase portion of [the transaction] for [her] benefit, that it was so [her] monthly payments–[she] wouldn't have to pay taxes on it." *Id.* According to Plaintiff, this was "double wammie wrong" because she "[did] have to pay taxes just like it was a purchase" and "because it's a monthly rental and [she] [could] lose everything that [she] paid toward it in a month's notice." *Id.* at 85-86. Finally, she maintains that she relied on the advice of Defendant Mr. Cleer, "who said [to] trust [him]." *Id.* at 87.

Even if the other elements of fraud are present in this case, Plaintiff cannot recover because she could not have justifiably relied on these statements. Plaintiff protests that "[she] would have never ever agreed to [the contract] if [she] would have realized what [she] was signing," but the

19

record indicates that she had ample opportunity to inspect the contract. *Id.* Plaintiff readily acknowledges, indeed argues, that "[t]he parties to the contract, Ms. Cleer and the Defendants, negotiated and bargained for the terms of the contract." *Plaintiff's Complaint*, at ¶ 29. At her deposition, Plaintiff agreed that she was provided the contract "documents ahead of time and [was] able to read them and [she] could have gotten [her] own attorney." *November 20, 2008 Deposition of Lorri Cleer*, at p. 87-88. Mr. Thompson effectively confirmed these facts when he agreed at his deposition that "[Defendant] knew she could hire an attorney, she just chose not to," apparently to "save money." *February 16, 2009 Deposition of Mickey Thompson*, at p. 66. Moreover, Plaintiff has admitted that the contract documents do not contain "any terms in them that [her] parents did not intend to follow when they signed [them]." *November 20, 2008 Deposition of Lorri Cleer*, at p. 87.

Essentially, Plaintiff negotiated a bargain from which she now seeks to extricate herself on the basis of a few vague statements made by Defendant Mr. Cleer prior to execution of the contract. However, these statements did not absolve Plaintiff of her duty to understand the nature of her agreement. For example, Plaintiff asks the Court to construe Defendant Mr. Cleer's statement regarding the contract being "a win/win situation" for Plaintiff and Defendants alike as some sort of guarantee that the lot of both parties would necessarily be improved through the agreement, but surely Plaintiff should have understood that the agreement involved risks, just like virtually every other agreement. *Id.* This statement could not have been justifiably relied upon by Plaintiff.

The Court declines Plaintiff's invitation to intervene and toss aside this bargained-for agreement because, now, with the benefit of hindsight, Plaintiff believes it was an error on her part to enter it. The statements allegedly made by Defendant Mr. Cleer could not have been justifiably

relied upon Plaintiff as a reason to enter the contract.  Summary judgment should be granted.

## IV. CONCLUSION

Pending before the Court is Defendants' Motion for Summary Judgment (doc. 36).  For the foregoing reasons, the Court **GRANTS** the motion.

The Court **DIRECTS** the parties to appear on **July 13, 2009** at **9:00 a.m.** to discuss further action on the Defendants' counterclaim.

The Court **DIRECTS** the Clerk to send a copy of this written Order and Opinion to counsel of record and any unrepresented parties.

ENTER: June 15, 2009

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE